376 F.2d 12
 Walter P. McFARLAND, Edward P. Johnson and John Loughran,
Plaintiffs-Appellants,
v.
George S. GREGORY, Alexander Westreich, N.V.
Handelmaatschappij Antilia, Sol Drescher and Louis
Rosenberg, Defendants-Appellees.
 No. 282, Docket 30845.
 United States Court of Appeals Second Circuit.
 Argued Jan. 6, 1967.
Decided April 19, 1967.
 
 Arthur S. Friedman, New York City (Tanner & Friedman, New York City, and Williams, Wadden & Stein, Washington, D.C., on the brief), for appellants.
 Morris B. Abram, New York City (Coudert Brothers and Simon H. Rifkind, William Rand and Gerald D. Stern, New York City, on the brief), for appellees.
 Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 Plaintiffs (the McFarland Group), purchasers of certain leaseholds formerly held by corporations controlled by defendants (the Gregory Group), appeal from a judgment of the United States District Court for the Southern District of New York denying their application for a judgment declaring that in connection with the sale of the leaseholds the defendants must supply sufficient parking facilities to comply with local zoning ordinances. We affirm the judgment.
 
 
 2
 The tangled history of the litigation between these parties with respect to the Arlington Towers project and the facts giving rise to it are fully described in the companion opinion of Chief Judge Lumbard, McFarland v. Gregory, 373 F.2d 393 (2d Cir. 1967).
 
 
 3
 For purposes of the present controversy it is sufficient to say that: Each of the four subsidiary corporations of the Arlington Towers Land Corporation owned an apartment house built on land leased from the Corporation for 99 years. The parent corporation and the subsidiaries were originally controlled by the McFarland Group. Control of the project shifted to the Gregory Group in 1957 after the McFarland Group had experienced financial difficulties. However, under a Memorandum Agreement between plaintiffs and defendants the four Arlington subsidiaries were required to sell their apartment buildings and 99 year leasehold interests to the McFarland Group if that Group made a tender as described in the Memorandum Agreement. After several years of argument and negotiation the parties finally reached agreement concerning the terms of an acceptable tender. The McFarland Group having fulfilled the requirements for such a tender, the buildings and leases were transferred to them late in the summer of 1965.
 
 
 4
 In June, 1966, the McFarland Group commenced this action seeking a declaration that the defendants are obligated, as lessors, to provide, along with the four apartment houses, sufficient parking facilities to comply with local zoning ordinances.
 
 
 5
 Plaintiffs' contention is based largely on certain statements made by one of defendants' counsel on October 31, 1962, in the course of the litigation which preceded the sale to the McFarland Group. On that date the parties were presenting to the trial court surveys showing how they proposed to allocate land between one of the Arlington buildings and an adjacent shopping center which was not to be included in the proposed sale. The allocation question was one of many issues that had been argued before the court and had been the subject of extensive briefs submitted by the parties during a protracted series of hearings over a period of several months. Plaintiffs had changed their position during the course of these proceedings as to how the land should be allocated and the parties were unable to agree. Finally the court requested that the parties submit surveys indicating where they believed the boundary lines should be drawn.
 
 
 6
 At the October 31st hearing plaintiffs' counsel unexpectedly injected a new issue into the case stating that he had just been informed that local zoning laws required that 233 parking spaces be provided for tenants of the building involved in the allocation controversy. In the course of the colloquy which followed, defendants' counsel made a number of statements the effect of which was that 'zoning restrictions are applicable to the landlord, which is the parent corporation, and whatever requirements there may be for parking are applicable to the lessor corporation. * * *' Plaintiffs contend that they relied on these statements and therefore did not press their claim with respect to the parking spaces. They claim that defendants are estopped from denying that they must supply sufficient parking to meet the zoning requirements.
 
 
 7
 Even assuming that the plaintiffs would have been justified in relying on statements made incidentally by counsel in the course of argument-- a doubtful premise in the context of this bitterly contested case-- it is clear that they did not in fact rely on the statements. Such reliance would be shown only if plaintiffs had failed to press for inclusion in the final agreement of a clause granting them the parking privileges they sought. On the contrary, McFarland did later propose such a clause and defendants rejected the proposal. It was thus made quite clear that plaintiffs were aware of the existence of a substantial dispute on the subject and were not relying on counsel's statements.[1]
 
 
 8
 Our view that plaintiffs did not in fact rely on counsel's statement finds support also in plaintiffs' attempt at the beginning of the August, 1965 proceedings before Judge Dimock to keep open 'the question of (defendants') obligation on parking.'
 
 
 9
 In addition to their claim of reliance defendants further contend that they reserved the parking question during the August 1965 proceedings and that the 1957 Memorandum Agreement itself requires by implication that defendants supply parking facilities.
 
 
 10
 That this bitterly contested tender agreement, culminating in an elaborate contract of sale, was intended to leave unresolved a question of such magnitude as the availability of parking space[2] is quite unbelievable. Moreover the transcript of the August hearings establishes that the right to seek these parking facilities was not then reserved for later determination. While the McFarland Group's counsel stated that 'by making that tender, we do not give up the rights that we have retained under the contract or under the judgments,' this remark must be read in the light of the immediately preceding discussion in which counsel reiterated his previously expressed position, that 'we are not waiving the rights which the (November 14, 1962) judgment gives to obtain a refund or reduction after closing of title.'
 
 
 11
 At the first of the August hearings, counsel for the McFarland Group requested the court to enter an order reserving jurisdiction with respect to the C Ground rights, the replacement fund and the obligation as to parking. No such order was made. Instead, the transaction was completed on the basis of defendant's stipulation that the tender which had been made would be accepted as one 'complying with and having only the consequences of one which complies with Paragraph 9 of the Memorandum Agreement.' The stipulation is properly to be read as leaving open the question of price, which had been specifically reserved by the November 14, 1962 supplemental judgment, and the question of the rights to C Ground, an issue which was governed by paragraph 6 of the Memorandum Agreement and was separate from the issues involved in a conveyance of the four leaseholds. But there is nothing in the language of the stipulation which can be read as reserving the parking matter.
 
 
 12
 Even if we were to assume that the stipulation made by defendants at the time of accepting the tender was effective to reserve plaintiffs' right to litigate its parking claim, we would conclude that the claim lacks substance. The trial judge construed the 1962 supplemental judgment to dispose of the plaintiffs' claim to parking space. His construction of his own decree is certainly entitled to considerable weight. However, we need not rest our affirmance on that basis since we find that plaintiffs' cause is not furthered even if we disregard the supplemental judgment and consider only the 1957 Memorandum Agreement. The McFarland Group recognizes that no obligation of the lessor to supply parking facilities is set forth in the Agreement but contends that such obligation is necessarily implied on the ground that the lessee is dependent on the lessor for parking and that since parking facilities are required by law the leaseholds are worthless unless the lessor is required to provide parking. The plaintiffs' proofs fail to establish the claim that in 1957, when the Memorandum Agreement was entered into, the lessee was thus dependent on the lessor. Moreover, there is no such dependence even now, for if space is no longer available outside the area of the Arlington project as it was in 1957, a premise which the Gregory Group contests, there is nothing to prevent the plaintiffs from using their own land for parking or from building a garage above or below the surface of that land.
 
 
 13
 Each lease imposes on the lessee the burden and expense of complying with 'all applicable building and zoning restrictions, regulations, resolutions, and ordinances, as the same may affect the demised premises.'[3] Even if the Memorandum Agreement were open for our consideration, to suggest that the lessee is entirely at the mercy of the lessor in meeting parking requirements and to educe from this dubious premise an implied obligation of the lessor to meet the requirements of the zoning ordinance as to parking would be to ignore the intention of the parties as set forth in their express undertaking.
 
 
 14
 Our disposition of the case makes it unnecessary for us to consider defendants' contention that a Virginia judgment dismissing plaintiffs' complaint in a previous action between these parties bars the McFarland Group's present claim.
 
 
 15
 The judgment denying plaintiffs' motion is affirmed.
 
 LUMBARD, Chief Judge (dissenting):
 
 16
 I dissent.
 
 
 17
 I would hold that the Memorandum Agreement requires the Gregory Group to supply the McFarland Group (and its successor lessees) as many parking spaces outside the leaseholds as the apartment buildings required in 1957 under Arlington County zoning regulations, as long as they are still required by those regulations.
 
 
 18
 The Gregory Group argues, and the majority holds, that the McFarland Group waived any claim to parking rights outside the leaseholds by its tender for and acquisition of the apartment buildings and leaseholds under paragraph 9 of the Memorandum Agreement. I would reject this argument for the same reasons that led us to reject the similar contention made in the companion appeal, that the August 1965 proceedings before Judge Dimock culminating in the paragraph 9 tender constituted a settlement of claims arising under the Memorandum Agreement. See McFarland v. Gregory, 373 F.2d 393, 397-98 (2 Cir. Feb. 24, 1967).
 
 
 19
 The McFarland Group emphasized several times during the August 1965 proceedings that by making the tender it did not intend to 'give up the rights that we have retained under the contract or under the judgments.' The same itent is manifested by the parties' stipulation, whose wording was suggested by Judge Dimock, that they would accept the tender agreed on 'as one which complies with and one having only the consequences of one which complies with paragraph 9.' The majority states that 'there is nothing in the language of the stipulation which can be read as reserving the parking matter'; but the stipulation clearly provides that its only effect is that the Gregory Group must accept the McFarland Group's tender. Moreover, the McFarland Group specifically stated on the first day of the August 1965 proceedings that one of the issues it intended to press after the paragraph 9 purchase was 'the question of their obligation on parking.' The weakness of the Gregory Group's argument that parking rights were waived is underscored by the fact that this was the only reference to parking rights during the August 1965 proceedings; the proposed contractual provision for such rights mentioned by the majority was put forward by the McFarland Group during the abortive negotiations of the previous months, which looked toward a complete settlement and exchange of releases. Thus the paragraph 9 tender and purchase were plainly not intended to work any waiver of the McFarland Group's claims under the Memorandum Agreement, and we should not give them that effect.[1]
 
 
 20
 The Gregory Group next contends that the dismissal on demurrer of a suit brought against it by the McFarland Group, just after the paragraph 9 closing, in the Circuit Court of Arlington County, Virginia, is res judicata of the present claim. That suit sought a declaration that the Gregory Group was obligated to continue to provide free parking to Arlington Towers tenants on the socalled LaPorte and Lynn Street tracts, across the street from Arlington Towers. The complaint alleged that the defendants had allowed tenants to park on both lots without charge, and that the plaintiffs were beneficiaries or assignees of agreements between Arlington Towers Land Corporation (Arlington) and two of its subsidiaries, which bound Arlington to provide 200 free parking spaces on the LaPorte tract. It did not mention the Memorandum Agreement. Thus both the facts upon which the present claim is premised and the relief it seeks are different from those in the Virginia suit. The Virginia suit is accordingly not res judicata, especially in view of the considerations of judicial economy favoring determination of the present claim by a court familiar with the Memorandum Agreement and the prior litigation between the parties. Cf., e.g., Erbe v. Lincoln Rochester Trust Co., 3 N.Y.2d 321, 165 N.Y.S.2d 107, 144 N.E.2d 78 (1957); Eason v. Eason, 204 Va. 347, 131 S.E.2d 280 (1963); Developments in the Law-- Res Judicata, 65 Harv.L.Rev. 818, 824-27 (1952).
 
 
 21
 Judge Dimock's finding that any reliance by the McFarland Group on the October 1962 statements of counsel for the Gregory Group was not to its detriment does not seem to me to be clearly erroneous.[2] However, I would hold that the Memorandum Agreement imposes an implied obligation on the Gregory Group to furnish to a purchaser of the buildings and leaseholds under paragraph 9 as many parking spaces outside the leaseholds as the buildings required in 1957 under Arlington County zoning regulations, as long as they are still required by those regulations. This obligation seems to me to be measured by the number of parking spaces required after the conversion of certain garage spaces in the buildings into offices which were leased to the federal government, as the McFarland Group's warranties attached to the sale agreement of April 15, 1967 stated that two such leases had been executed and that a third was planned. At least after these conversions Arlington Towers complied with the zoning regulations as to parking only because its tenants could park in the shopping center, C Ground, and the LaPorte tract, all owned by Arlington.[3]
 
 
 22
 I do not believe that the Memorandum Agreement contemplated that the Gregory Group should be able to withhold the parking necessary to comply with zoning regulations from a purchaser of the buildings and leaseholds under paragraph 9. If the Gregory Group were free to withhold the required parking, it could by doing so compel the payment of substantially more than the formula minimum price for the buildings and leaseholds under paragraph 9, which this Court has held the Memorandum Agreement did not require, McFarland v. Gregory, 363 F.2d 857 (2 Cir. 1966), and thus render the McFarland Group's rights under paragraph 9 largely, if not wholly, meaningless. If, therefore, paragraph 9 was intended to provide meaningful rights-- as I believe it was-- it clearly implies that the Gregory Group must provide a paragraph 9 purchaser with the off-leasehold parking required by zoning regulations in 1957, as long as those regulations still require it.
 
 
 23
 The Gregory Group relies heavily upon the fact that the leases executed by Arlington and its subsidiaries in 1953 and 1954 bound the lessees in general terms 'to comply with all lawful government requirements in connection with (their) use and occupancy.' As far as parking is concerned, these general provisions seem to me to be outweighed by the clear implication of the Memorandum Agreement. Moreover, the record does not suggest that either the McFarland or the Gregory Group required the subsidiaries to pay for any off-leasehold parking furnished by Arlington. On the contrary, Arlington bound itself in July 1957 to supply 200 free spaces for Arlington Towers tenants in the LaPorte tract. Thus the obligation to supply off-leasehold parking which seems to me to be imposed by the Memorandum Agreement is consistent with the parties' conduct as reflected by the record.
 
 
 
 [1]
 In the view we take of the case we find it unnecessary to pass on the trial court's finding that plaintiffs suffered no injury from their claimed reliance
 
 
 [2]
 Defendants claim that they would have to supply land worth approximately four million dollars to comply with plaintiffs' demands
 
 
 [3]
 Each lease also contained the following provisions:
 Article II. Section 1. The Tenant shall have the right to use and occupy the demised premises for any lawful purpose and will comply with all lawful government requirements in connection with such use and occupancy.
 Article VI. Section 1. The Tenant covenants throughout the term of this lease, at the Tenant's sole cost and expense, promptly to comply with all laws and ordinances and the orders, rules, regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof, and the orders, rules and regulations of the Board of Fire Underwriters, or any other body now or hereafter constituted exercising similar functions, foreseen or unforeseen, ordinary as well as extraordinary and whether or not the same require structural repairs or alterations, which may be applicable to the demised premises, the fixtures and equipment thereof and the sidewalks, curbs and vaults, if any, adjoining the demised premises or the use or manner of use of the demised premises. The Tenant will likewise observe and comply with the requirements of all policies of public liability, fire and all other policies of insurance at any time in force with respect to the buildings and improvements on the demised premises and the equipment thereof.
 
 
 [1]
 The Gregory Group has not contended that the McFarland Group waived its claims under the Memorandum Agreement by the paragraph 9 purchase as a matter of law, irrespective of the intent of the parties. Compare, e.g., High Knob, Inc. v. Allen, 205 Va. 503, 138 S.E.2d 49 (1964); Sale v. Figg, 164 Va. 402, 180 S.E. 173 (1935); Restatement, Contracts 240(1)(b), 413 (1932)
 
 
 [2]
 The majority concludes that 'the trial judge construed the 1962 supplemental judgment to dispose of the plaintiffs' claim to parking space.' Judge Dimock did not state expressly that he so construed the 1962 judgment; and the conclusion that he did seems to me inconsistent with his careful consideration of the McFarland Group's claim of estoppel
 
 
 [3]
 The Gregory Group contended below that the offices leased to the federal government were exempt from the parking requirements of the Arlington County zoning regulations. Judge Dimock did not pass upon this contention, and it has not been renewed upon appeal. Even if it were upheld, it would not eliminate the deficit of parking spaces under the zoning regulations in 1957